**In re Anonymous No. 67 D.B. 88**

Disciplinary Board Docket No. 67 D.B. 88.

GILARDI, *Chairman,* January 8, 1993—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## HISTORY OF PROCEEDINGS

Respondent was admitted to the practice of law in the Commonwealth of Pennsylvania on October 3, 1972. His office is located at [    ].

A two-charge petition for discipline was filed against respondent by the Office of Disciplinary Counsel on July 1, 1988. The petition for discipline was amended in part pursuant to an order dated December 9, 1988 in which the Disciplinary Board granted the petitioner's motion to amend petition for discipline. In Charge I, respondent was accused of neglecting his client's legal matter, commingling of funds, and utilizing client funds for his own benefit. In Charge II, petitioner averred that respondent had neglected a legal matter and charged an unlawful fee.

On August 4, 1988, the matter was referred to Hearing Committee, [    ] comprised of [    ], Esq., Chair, [    ], Esq. and [    ], Esq. An evidentiary hearing was held on March 29, 1989. The Hearing Committee recommended that respondent be suspended from the practice

of law for a period of two years retroactive to March 1987, placed on probation for five years and permitted automatic reinstatement to the practice of law.

The Office of Disciplinary Counsel filed a brief on exceptions on February 7, 1990 in which petitioner took no exception to the findings of fact or conclusions of law, but only excepted to the Hearing Committee's recommendation for discipline. Office of Disciplinary Counsel argues that the committee's recommendation of automatic reinstatement is without authority under the Pennsylvania Rules of Disciplinary Enforcement. Petitioner urges that "respondent be suspended for a period not less than two years effective 30 days from the date of such order." (Petitioner's brief on exceptions, p. 15.) On February 27, 1990, respondent filed a brief opposing the exceptions taken by petitioner in which respondent requested adoption of the Hearing Committee's recommendation of discipline.

Thereafter, the matter was referred to the board for review and recommendation. The matter was adjudicated by the board at its regularly scheduled meeting held on March 9, 1990.

## SUMMARY OF EVIDENCE

On August 4, 1988, respondent through counsel, [A], Esq., filed an answer to the petition for discipline in which respondent admitted to virtually the entire factual context of the matter and the violation of certain Disciplinary Rules of the Code of Professional Responsibility. As a result of respondent's admissions, the parties entered into a stipulation which incorporated the petition for discipline and respondent's answer. The Hearing Committee accepted into evidence the stipulation as agreed by the parties along with petitioner's Exhibits P-1 through P-48L which permitted the committee to conduct a joint hearing

on the merits and on discipline to be imposed, pursuant to Disciplinary Board Rule section 89.151(d)(1).

At the hearing, respondent did not contest the allegations, but presented testimonial evidence in explanation and mitigation. Dr. [B], a psychiatrist who has treated respondent for depression and addiction, testified to the nature of respondent's impairment, his treatment, and respondent's subsequent "180-degree turnaround." [C], an addiction counselor at the Clinical Institute of [D] Hospital, testified to his observation of respondent going through rehabilitation and the out-patient recovery program. [E], Esq., a lawyer who is active in the Lawyer's Recovery Program, testified to the excellent progress respondent has made in overcoming his addiction. [F], Esq., a business associate of respondent; [G], brother of respondent; and respondent's mother, [H], all testified to the dramatic change in respondent since his rehabilitation. Respondent also testified on his own behalf, recalling his long past history of alcohol and drug abuse and describing the treatment which led him on his way to a remarkable recovery.

Office of Disciplinary Counsel proceeded by way of stipulation and did not present any witnesses to contest respondent's evidence of his rehabilitation.

## Charge I

Charge I of the petition for discipline related to respondent's representation of [I] in claims arising from a motor vehicle accident. Respondent admits to commingling personal injury protection (PIP) funds received on behalf of [I] for outstanding medical bills, failing to forward the proceeds to the medical providers, and utilizing the funds for his own benefit. Respondent also admits neglecting [I's] property damage claims and failing to protect [I's] interest in claims brought by the opposing party.

## Charge II

Charge II arises from respondent's representation of [J] and her daughter-in-law, [K], in claims arising from an auto accident. Respondent admits to neglecting his clients' legal matters, allowing the statute of limitations to expire as to the clients' third-party claims, and charging an unlawful fee for obtaining uncontested personal injury protection benefits.

## FINDINGS OF FACT

### Charge I

The board adopts the following facts as stipulated by counsel:

(1) On August 7, 1984, [I] was injured as a result of a collision in which his automobile was struck by a [L] trolley.

(2) On August 8, 1984, [I] retained respondent to represent him in claims against [L] for the repair of his car and for his personal injuries.

(3) Respondent and [I] agreed to a 40 percent contingent fee with respect to the bodily injury claim.

(4) Respondent also agreed to pursue [I's] claims for personal injury protection benefits under a policy of insurance held by [I] with [M] Insurance Co. In regard to the PIP claims, respondent agreed not to charge a fee.

(5) By letter dated August 9, 1984, respondent advised [M] of his representation of [I] with respect to the property damage and PIP claims and requested [M] to forward to [I] a PIP application and an attending physician report form.

(6) By letter dated August 24, 1984, [N] of [M] advised [I] to submit his medical bills first to his health insurance

carrier, after which [M] would pay any outstanding balance.

(7) By letter dated September 12, 1984, respondent forwarded to [N] the completed and executed PIP application.

(8) By letters dated October 24, November 16, and December 7, 1984, respondent forwarded to [M] medical reports and bills of [I].

(9) By letter dated December 18, 1984, [M] forwarded to respondent a check dated December 20, 1984 in the amount of $21.75, payable to "[I and respondent]" in reimbursement for a prescription purchased by [I].

(a) Respondent obtained the endorsement of [I] on the check and endorsed it in his own name.

(b) Respondent caused the check to be deposited into his account no. [    ] at [O] Bank, captioned "[Respondent] Escrow Account."

(c) Respondent failed to disburse these funds to [I].

(10) By letters dated January 28, April 24, April 29, May 8, and May 20, 1985, respondent forwarded bills and reports with respect to [I's] treatment to [M].

(11) [I] received treatment from Dr. [P] at the [Q] Professional Association resulting in a total bill of $300.

(12) [I] was also treated by Dr. [R], resulting in a total bill of $750, which was sent to respondent. [I] received reminder bills and so advised respondent's office.

(13) Under cover of letters dated October 15, October 22, November 15, and December 15, 1985, respondent submitted Dr. [P's] and Dr. [R's] bills to [M] for payment.

(14) Under cover of a letter dated December 11, 1985, [M] remitted to respondent a check in the amount of $1,050, payable to [I] and respondent in reimbursement of the bills of Dr. [P] and Dr. [R].

(a) Respondent submitted the check to [I]. Pursuant to respondent's request, [I] endorsed the check and returned it to respondent.

(b) On January 8, 1986, respondent deposited the check into his escrow account. However, respondent failed to forward the proceeds to Dr. [R] and Dr. [P].

(c) Respondent failed to advise [I] that he had neglected to pay the bills of Dr. [R] and Dr. [P].

(15) On four occasions between December 1985 and May 1986, Dr. [R] resubmitted his bills to [I].

(a) Upon receipt of the reminder bills, [I] attempted to contact respondent by telephone and in person. However, on each occasion, [I] was told by respondent's secretary that respondent was unavailable. Respondent failed to return the calls of his client.

(16) By letter dated March 2, 1987, [I] requested that respondent make payment to Dr. [R] and Dr. [P].

(17) Thereafter, under cover of letters dated March 4, 1987, respondent made payment to Dr. [P] and Dr. [R] of the funds due to them.

(18) Subsequent to respondent's deposit of the [I] PIP funds into the escrow account, the balance therein fell below the amount due to be paid to [I's] medical providers.

(a) The withdrawals from respondent's account resulting in the insufficient balance were made by respondent for his own use and benefit and not for the benefit of [I] or his medical providers.

(b) Those withdrawals were made without the knowledge or consent of [I].

(19) Prior and subsequent to the time respondent deposited [I's] funds into the escrow account, the account held funds belonging to other clients. In addition, respondent failed to maintain adequate records of his escrow

account for the period of July 1, 1986 through May 13, 1987.

(a) On January 8, 1986, respondent deposited into his escrow account a check in the amount of $159.76 payable to respondent and [S] (client) issued by [T] Insurance Co. for [S's] medical bills. Respondent failed to distribute the funds to [S] or to his medical provider.

(b) On February 5, 1986, respondent deposited into his escrow account a check in the amount of $501.85 payable to [U and respondent] issued by [V] Insurance Co. for [U's] medical bills. Respondent failed to distribute the funds to [U] or to her medical provider.

(20) Thereafter, [L] filed suit in [ ] [ ] Court against [I] alleging that he had caused the property damage to the [L] vehicle in the accident through his negligence and demanding payment of $1,264.48.

(a) On August 2, 1986, [I] was served with the [ ] Court complaint and notified of a hearing scheduled for August 12, 1986.

(b) On August 4, 1986, [I] went to respondent's office to give him a copy of the summons and was told by respondent's secretary that respondent was in court.

(c) Upon the secretary's request, [I] gave the summons to her.

(d) [I] asked that respondent contact him immediately with respect to the matter.

(e) On August 5, 1986, [I] again contacted respondent's office and left a message requesting a return call.

(f) By telephone call of August 8, 1986, [I] again contacted respondent's office but was unable to reach respondent.

(g) Respondent failed to call [I] nor did he take any action with respect to the [ ] Court action.

(h) On August 11, 1986, [I] obtained a copy of the summons and provided it to [M].

(21) Respondent failed to file suit against [L] based upon [I's] personal injury and property damage claims within the applicable statute of limitations.

(a) Respondent failed to respond to [I's] inquiries or to notify [I] of the fact that he had not pursued the [L] claims.

(22) If called as a witness, [I] would have testified that respondent did not advise him prior to August 7, 1986 that the statute of limitations would run on his claim on that date.

## Charge II

(23) On January 30, 1984, [K] and her mother-in-law, [J], were involved in an automobile accident and sustained injuries. The vehicle driven by [K] in which [J] was a passenger was struck by a vehicle driven by [W] and owned by [W's] employer, [X] Inc.

(24) Shortly thereafter, [K] and [J] retained respondent to represent them in all claims arising from the accident, including claims for personal injury protection benefits.

(25) At the time of the accident, [M's] vehicle was insured by [Y] Insurance Co. and the [X] vehicle was insured by [Z] Insurance Co.

(26) Respondent wrote to [X] Inc. by letters dated February 7, February 29 and March 28, 1984.

(27) By letter dated February 7, 1984, respondent notified [Y] of his representation of [J] and [K].

(28) By letters dated March 30, April 4, April 6, April 26, June 21, July 13, and August 8, 1984, respondent communicated with [Y] concerning [J and K's] claims.

(29) On August 7, 1984, a check in the amount of $3,246.08 was issued by [Y] to [J] for personal injury protection wage loss benefits and forwarded to respondent.

(a) Respondent forwarded to [J] the [Y] Insurance Co. check. As requested by respondent, [J] endorsed the check and returned it to respondent.

(b) Despite the fact respondent had no fee agreement with [J] in regard to the collection of PIP benefits, respondent deducted his fee in the amount of $300 and forwarded to [J] a check in the amount of $2,946.08.

(c) Under the No-Fault Act then in effect, it was impermissible to charge a claimant a fee for obtaining PIP benefits except by a separately paid fee based upon services provided.

(d) Subsequently, [J], along with her son and daughter-in-law, requested that respondent refund the $300 which he had deducted. Respondent failed to do so.

(30) Thereafter, by letter dated August 30, 1984, respondent forwarded to [K] a check in the amount of $1,924.34, issued by [Y] for her personal injury protection wage loss benefits. Respondent requested that [K] endorse and return the check to him. However, [K] refused to return the check to respondent.

(31) By letter dated September 6, 1984, respondent wrote to [AA] Associates, the adjuster for defendant [X] in regard to [J and K's] claim.

(32) By letter dated February 25, 1985, respondent forwarded to [K] four affidavits as to pleadings, two each for herself and [J] to sign.

(a) At respondent's request, the clients signed and returned the affidavits. However, respondent did not attach any pleadings to the affidavits and did not advise [K] as to the necessity of proper notarization of the affidavits.

(33) Thereafter, respondent failed to communicate with [J] and [K].

(34) If called to testify, an appropriate representative of the insurance carrier for [X] Inc., [BB] Inc., would testify as follows:

(a) [BB] had the following contacts with respondent in regard to the claims of [J] and [K] as reflected by its file maintained in the ordinary course of business:

(i) By letter dated September 6, 1984, respondent forwarded to [CC] of [AA] Associates a complete list of medical specialists and documentation with respect to the claims of [J] and [K].

(ii) On February 28, 1985, a claims representative telephoned respondent and was advised that he was on vacation until May 12, 1985. The representative advised respondent's secretary that [BB] denied [Y's] subrogation and that they paid a property damage claim. The representative left a message for respondent to call [DD] upon his return.

(iii) On September 14, 1985, a claims representative called respondent and left a message.

(iv) On October 4, 1985, a claims representative called respondent and reviewed the matter with him. At that time, respondent informed the representative that the plaintiff alleged that the defendant-driver ran a stop sign. Respondent provided the name and address of the witness.

(v) On November 1, 1985, a representative called respondent concerning settlement and offered $3,000 to [J] and $3,200 to [K]. However, respondent wanted $7,500 for each of his clients and was to get back to the representative.

(vi) On January 27, 1986, a representative called respondent concerning the status of the settlement offer and left a message for him.

(vii) By letter dated January 30, 1986, [DD] wrote to respondent and requested that respondent contact her concerning the claims of his clients.

(8) On February 25, 1986 and March 31, 1986, a representative of [BB] called respondent and left a message.

(9) The file reflects that a letter was sent to respondent on March 31, 1986, but there is no copy of the letter in the file.

(10) On April 17, 1986, respondent called to settle the case. The claims representative advised respondent that the statute of limitations ran on January 30, 1986. Respondent was very upset and said that he had not filed suit.

(35) On October 27, 1986, [K] called respondent and he told her that his files were in disarray because he had moved. Respondent then informed her that he had failed to file suit within the applicable statute of limitations, he had no malpractice insurance, and he would meet with her to attempt to settle the matter.

(36) In or about February 1987, [J] made a claim against respondent to the Pennsylvania Client Security Fund (CSF) concerning these matters.

(a) Shortly thereafter, respondent was put on notice of that claim.

(b) By check dated October 27, 1987, forwarded to the CSF, respondent refunded the $300 PIP fee to [J].

(37) Respondent did not take any further action to compensate [K] or [J] with respect to their losses as a result of his neglect of their legal matter until 1988, when he entered into an agreement to pay them $4,250, including counsel fees.

## ADDITIONAL FINDINGS OF FACT

The board adopts the following findings of fact as determined by the Hearing Committee.

(38) Respondent has not compensated [I] for the losses which resulted from respondent's failure to properly pursue the claims of his client and defend the claims brought against his client, [I].

(39) Respondent has a prior disciplinary record consisting of three informal admonitions administered in 1983 and 1984 for the violation of the following Disciplinary Rules: D.R. 6-101(A)(3); D.R. 7-101(A)(1); D.R. 7-101(A)(2); D.R. 9-102(A); and D.R. 9-102(B)(4).

(40) Respondent has filed an attorney registration statement for each year from 1984 through 1988, inclusive, each of which was timely filed except for the statement for the period of July 1, 1987 through June 30, 1988.

(41) Respondent claimed that he had voluntarily ceased practicing law in March 1987.

(42) Respondent has suffered from manic depressive illness since at least 1965. Respondent's condition is a bipolar illness which is characterized by extreme mood swings causing respondent to experience periods of suicidal depression and the extreme opposite emotion of total elation.

(43) Respondent's bipolar illness was compounded during the relevant period by chronic, late-stage drug and alcohol addiction which began in approximately 1968 when respondent attended law school at the [EE] University School of Law. Respondent's alcohol problem began in 1964, his freshman year of college at the University of [FF].

(44) In addition, respondent was diagnosed as hypothyroid which means he had an underactive thyroid. This condition activated his underlying mood disturbance.

(45) From approximately 1972 through 1982, respondent's addiction and bipolar illness negatively affected his law practice and his personal life in increasingly serious ways.

(46) By the early 1980's, respondent's addiction was out of control, and this, combined with periods of depression, made his life unmanageable.

(47) Respondent sought psychiatric help on numerous occasions, including 1964, 1968, 1976 and 1979; however, the combination of illnesses suffered by respondent made diagnosis and therapy difficult and resulted in both illnesses growing progressively worse with time.

(48) In February 1986, respondent sought professional help for his addiction and was admitted for a one month inpatient rehabilitation program at the [GG] Hospital. He relapsed shortly after his discharge.

(49) In February 1987, respondent again sought professional help for his addiction and was subsequently admitted to the [HH] Institute in [    ].

(50) Respondent remained in the inpatient treatment program at [HH] for a total of seven months, including six months in the intensive rehabilitation program.

(51) Since the fall of 1987, respondent has been a regular and active member of Alcoholics Anonymous and Narcotics Anonymous.

(52) Respondent's bipolar illness has been effectively treated with lithium carbonate since 1986 and respondent's underactive thyroid condition is now under control.

(53) During the relevant periods of time from 1984 to 1986, there was a direct and substantial, causal relationship between respondent's mental illness and his professional misconduct.

## CONCLUSIONS OF LAW

Respondent has violated the following Disciplinary Rules of the Code of Professional Responsibility:

(a) D.R. 1-102(A)(4)—A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(b) D.R. 1-102(A)(6)—A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law;

(c) D.R. 6-101(A)(3)—A lawyer shall not neglect a legal matter entrusted to him;

(d) D.R. 7-101(A)(1)—A lawyer shall not intentionally fail to seek the lawful objectives of his client through reasonably available, lawful means;

(e) D.R. 7-101(A)(2)—A lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services;

(f) D.R. 7-101(A)(3)—A lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship;

(g) D.R. 9-102(A)—All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to a lawyer or law firm shall be deposited therein;

(h) D.R. 9-102(B)(3)—A lawyer shall maintain complete records of all funds, securities and other properties of a client coming into possession of a lawyer and render appropriate accounts to his client regarding them; and

(i) D.R. 9-102(B)(4)—A lawyer shall promptly pay or deliver to a client as requested by a client the funds,

securities, or other properties in possession of the lawyer which the client is entitled to receive.

## DISCUSSION

The parties have stipulated to the violation of certain Disciplinary Rules of the Code of Professional Responsibility and the underlying facts which support such violations. In regard to his representation of [I], respondent admitted to commingling of funds, utilizing funds for his own benefit, neglecting his clients' claims, and failing to protect his client's interest in claims brought by the opposing party. In reference to the [J] and [K] case, respondent admitted to neglecting his clients' legal matter, allowing the statute of limitation to expire as to the clients' third-party claims, and charging an unlawful fee for obtaining uncontested personal injury protection benefits. However, at no time did respondent attempt to conceal his neglect or misrepresent the status of his clients' legal matter.

In addition to the Disciplinary Rule violation stipulated by counsel, the Hearing Committee found that respondent's conduct constituted a violation of the Disciplinary Rules under Canon 7 which require the element of intent. Respondent argued that his history of drug and alcohol abuse and psychiatric problems produced a diminished capacity so as to negate the requisite intent for these violations. The Hearing Committee properly rejected respondent's argument. Respondent did not offer any evidence indicating that he was unable to understand the nature of his conduct. Before the start of the hearings, respondent's counsel, [A], Esq., made the following statement to the committee:

"[W]e are not contending that [respondent] was so insane that he didn't know what he was doing, nothing like that.... He admits he knew what he was doing, knew

the status of the bank accounts and in general what was happening with these various shares that are referred to in the pleadings and in the stipulation." (N.T. 6.)

Respondent's argument that he lacked specific intent due to his addiction and psychiatric problems fails on another ground. Diminished capacity does not constitute a defense in disciplinary proceedings to violations which require a specific intent. See *In re Anonymous,* Board Report No. 16 D.B. 88; *In re Anonymous Nos. 1 D.B. 80, 15 D.B. 79, and 23 D.B. 79,* 22 D.&C.3d 324, 330 (1984).

Although mental illness or substance abuse cannot constitute a defense to an infraction of the Disciplinary Rules, where a psychiatric disorder or substance abuse is a causal factor in producing the professional misconduct, such disorder or substance abuse may be considered as mitigating factors in the dispositional stage of the case. *Office of Disciplinary Counsel v. Seymour H. Braun,* 520 Pa. 157, 553, A.2d 894 (1989).

It is undisputed that respondent suffered from polysubstance addiction and mental illness during the pertinent years in which the misconduct occurred. The evidence in the record is conclusive and uncontradicted. Dr. [B], clinical director of mental health of [D] Hospital and associate chairman of the Department of Psychiatry at [D] Hospital, began treating respondent in 1979 and has continued to the present with some interruption. Dr. [B] testified that respondent suffered from a long history of polysubstance abuse, usually a mixture of alcohol and other drugs; manic depression which in respondent's case is a bipolar illness characterized by extreme mood swings; and a hypothyroid condition which aggravates his underlying mood disturbance. Dr. [B] testified that at times he believed respondent was barely functional. Respondent testified that from 1972-1982 he was following a

self-prescribed regimen of amphetamines and then alcohol and depressants to eventually calm him down in order to sleep. By the 1980s respondent replaced the amphetamines with cocaine or street amphetamines. Respondent's condition affected his life in many ways. Respondent was involved in a alcohol-related car accident in which he crushed his right forearm and broke his back. By 1984, respondent's marriage was broken and he left his wife. By 1987, respondent's practice had dwindled to nothing and he required assistance from other attorneys to clear the remaining files. Dr. [B] testified that when he first saw respondent in 1979, respondent was "severely depressed" to the degree that he needed medication. (N.T. 10.) Dr. [B] was afraid that respondent might kill himself: "I can honestly say that I was very frightened and fearful for his life on many occasions." (N.T. 13.) Respondent's mood disorder combined with his attempt at self-medication led to a course of on going distortion of his perception of reality. There were many times when Dr. [B] felt that respondent was "severely psychiatrically impaired." (N.T. 13.) Now, in retrospect, Dr. [B] realizes that respondent also suffered from denial of psychiatric problems.

Dr. [B] testified that there is no question whatsoever that respondent's psychopathology existed between 1984 and 1986, the time in which the misconduct occurred. A review of the record convinces us that the record establishes that respondent's substance abuse and medical condition were factors causing his misconduct.

On cross-examination, Dr. [B] reaffirmed his belief as to the extent the impairment affected respondent, stating: "There is no question in my mind that this impairment had adversely affected his judgment so severely that it interfered with [respondent's] ability to practice law, to

cope with his marriage, to acknowledge friendship, and to live life." (N.T. 33.)

The Hearing Committee found credible Dr. [B's] uncontradicted testimony that there is a causal connection between respondent's mental disability and his professional misconduct. After a complete review of the record, the board also finds that during the pertinent period of time between 1984 and 1986, there was a direct and substantial causal relationship between respondent's mental illness and his professional misconduct. We will now examine the rehabilitative aspects of this case.

During the initial consultation, Dr. [B] was concerned about respondent's general health and referred respondent to an internist and an orthopedic surgeon to correct some of the physical problems respondent was experiencing. Since 1986 Dr. [B] has effectively treated respondent with lithium carbonate to control respondent's bipolar illness. Respondent also was treated for his underactive thyroid and the problem is now under control.

On February 20, 1986, respondent was admitted to the [II] Program at the Clinical Institute of [D] Hospital. [C] served as respondent's addiction counselor for the 28-day program. [C] also was responsible for group therapy, individual counseling and patient education. One year later in February 1987, respondent was readmitted to the [II] Program. Upon determining that respondent required more than a four-week program, [C] and others involved in respondent's treatment referred respondent to a long term treatment program at the [HH] Drug and Alcohol Rehabilitation Center in [    ]. Respondent remained in the inpatient treatment program at [HH] for a total of seven months, including six months in the intensive rehabilitation program.

After his return from [    ], respondent enrolled in the [JJ] Program at the [D] Hospital on September 17, 1987.

The [JJ] Program is a recovery program which monitors the progress of a recovering patient from rehab to every day life. [C] testified that respondent has actively participated in every group session and has not missed a group meeting since he had joined.

Respondent attends AA meetings on a daily basis and is actively involved with the group. Respondent took on the responsibility of serving as the Intergroup representative for his group in [    ]. Intergroup is a group that meets periodically and reports to Alcohol World Services in New York in an effort to share information and communications.

Dr. [B] testified that beginning in February 1987 respondent made a "180-degree turn." (N.T. 18.) Dr. [B] attributed this dramatic improvement to the success of the lithium treatment in controlling respondent's mood disorder, the successful thyroid treatment and most importantly, the fact respondent is alcohol- and drug-free. Dr. [B] testified that respondent has changed dramatically in every way:

"I think his whole general demeanor is markedly changed. There is a certain consistency to his presenting himself in my office which didn't change for years. There were times when he would show up with a hangover and times when he would show up intoxicated.

"His mood is much more normal. He has been paying much more attention to his general health. He is probably in better physical condition than he has been in the 10 years that I have known him. He is just being much more respectful of himself. I think his relationships across the board have gotten healthier. He is totally persuaded, fully committed to remain drug free and to do everything he can possibly do to rehabilitate himself." (N.T. 19.)

Other witnesses testified at the hearing, describing the changes in respondent since his successful treatment pro-

gram in 1987. [C], addiction counselor, found respondent's participation in the outpatient program to be meaningful and devoted. [E], Esq., a lawyer who is active in the Lawyer Recovery Program, testified that based on his observations of respondent at AA meetings and during their regular telephone conversations, respondent was making excellent progress in overcoming his addiction.

[F], Esq., a business associate of respondent, testified to the following:

"I noticed when I knew [    ] (respondent) before, although he was always a decent, considerate kind of person, he seemed to feel lost in his personal affliction. Since he went to [    ] for his recovery, he seems just much more stable, more sense of duty in his responsibilities. I think there has been an enormous change from my point of view in the last two years. Particularly, I think he is calmer, more focused. He seems to be resolved to overcome this personal affliction of his." (N.T. 53.)

Respondent's brother, [G], with whom respondent resides, testified that respondent was working "incredibly hard" at his recovery program and his involvement with AA represented a total commitment. (N.T. 56, 57.) Respondent's mother, [H], described the changes in respondent as "wonderful" and found the difference in respondent to be his commitment to rehabilitation and the fact that he has become a more reliable person. (N.T. 61, 63.)

Respondent is currently employed at a construction company where he has been asked to become a partner in the company. Respondent stated: "I am incredibly feeling like a whole person. I would like to be able to go back to practice. I think I can add something. [I]n the context of my life on a daily basis I try to adhere

to what we call spiritual principles and that includes honesty and diligence." (N.T. 77, 78.)

In light of the above evidence, the board finds respondent to be presently fit to practice law and his return to practice will not be harmful to the public.[*]

## RECOMMENDATION

Based on the foregoing, the Disciplinary Board recommends that respondent [    ] be suspended from the practice of law for two years, the suspension be stayed in its entirety, and respondent be placed on probation for a period of two years subject to the following conditions:

(1)  Respondent shall abstain from using alcohol or any other mind-altering chemical;

(2)  Respondent shall regularly attend Alcoholics Anonymous meetings on a weekly basis;

(3)  Respondent shall obtain a sponsor in Alcoholics Anonymous and maintain weekly contact with that sponsor;

(4)  A sobriety monitor shall be appointed to monitor respondent in accordance with Disciplinary Board Rule 89.293(c);

(5)  Respondent shall furnish his sobriety monitor with his Alcoholics Anonymous sponsor's name, address and telephone number;

---

* The Hearing Committee gave considerable weight to the fact respondent voluntarily removed himself from the practice of law since March 1987. The board commends respondent for recognizing his problem and removing himself from the system. However, in the absence of a formal change in status such as a transfer to inactive status pursuant to Rule 219(i), Pa.R.D.E., the board cannot consider this factor in mitigation.

(6) Respondent shall establish his weekly attendance at Alcoholics Anonymous meetings by providing written verification on a board-approved form to his sobriety monitor;

(7) Respondent shall undergo any counseling, outpatient or inpatient treatment prescribed by a physician or alcohol counselor;

(8) With the sobriety monitor, respondent shall:

(a) meet at least twice a month;

(b) maintain weekly telephone contact;

(c) provide the necessary properly executed written authorizations to verify his compliance with the required substance abuse treatment; and

(d) cooperate fully.

(9) The appointed sobriety monitor shall:

(a) monitor respondent's compliance with the terms and conditions of the order imposing probation;

(b) assist respondent in arranging any necessary professional or substance abuse treatment;

(c) meet with respondent at least twice a month, and maintain weekly telephone contact with respondent;

(d) maintain direct monthly contact with the Alcoholics Anonymous chapter attended by respondent;

(e) file with the secretary of the board quarterly written reports; and

(f) immediately report to the secretary of the board any violations by the respondent of the terms and conditions of the probation.

It is further recommended that the court direct the respondent to pay all the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Messrs. Padova, Tumolo, Gilbert, Keller and Eckell were absent and did not participate in the adjudication.

## ORDER

And now, February 3, 1993, the report and recommendations of the Disciplinary Board of the Supreme Court of Pennsylvania dated January 8, 1993 are approved, and it is ordered that [respondent] be suspended from the practice of law for a period of two years, that the suspension be stayed in its entirety, and that the respondent be placed on probation for a period of two years subject to the following conditions:

(1) Respondent shall abstain from using alcohol or any other mind-altering chemical;

(2) Respondent shall regularly attend Alcoholics Anonymous meetings on a weekly basis;

(3) Respondent shall obtain a sponsor in Alcoholics Anonymous and maintain weekly contact with that sponsor;

(4) A sobriety monitor shall be appointed to monitor respondent in accordance with Disciplinary Board Rule 89.293(c);

(5) Respondent shall furnish his sobriety monitor with his Alcoholics Anonymous sponsor's name, address and telephone number;

(6) Respondent shall establish his weekly attendance at Alcoholics Anonymous meetings by providing written verification on a board-approved form to his sobriety monitor;

(7) Respondent shall undergo any counseling, outpatient or inpatient treatment prescribed by a physician or alcohol counselor;

(8) With the sobriety monitor, respondent shall:

(a) meet at least twice a month;

(b)  maintain weekly telephone contact;

(c)  provide the necessary properly executed written authorizations to verify his compliance with the required substance abuse treatment; and

(d)  cooperate fully.

(9)  The appointed sobriety monitor shall:

(a)  monitor respondent's compliance with the terms and conditions of the order imposing probation;

(b)  assist respondent in arranging any necessary professional or substance abuse treatment;

(c)  meet with respondent at least twice a month, and maintain weekly telephone contact with respondent;

(d)  maintain direct monthly contact with the Alcoholics Anonymous chapter attended by respondent;

(e)  file with the secretary of the board quarterly written reports; and

(f)  immediately report to the secretary of the board any violations by the respondent of the terms and conditions of the probation.

It is further ordered that the respondent shall pay the expenses of investigating and prosecuting this matter, pursuant to Rule 208(g), Pa.R.D.E.